UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA     )
                             )
              v.             )  Nos. 09-cr-30021-MAP
                             )        12-cv-30108-MAP
JEREMIAH J. SALAMON          )

ORDER RE: MOTION TO VACATE
(Dkt. No. 99)

December 7, 2016

PONSOR, U.S.D.J.

## I.   INTRODUCTION

Petitioner Jeremiah J. Salamon has filed a motion to vacate his 236-month sentence, arguing that his attorney provided him ineffective assistance in connection with his guilty plea to a four-count superseding indictment charging him with offenses relating to the sexual exploitation of minors.  For the reasons set forth below, the motion will be denied.

## II.   PROCEDURAL BACKGROUND

On July 30, 2009, a criminal complaint issued against Salamon charging him with distribution of material involving the sexual exploitation of minors.  He was arrested the same day and detained.  On September 1, 2009, the Grand Jury returned a one-count indictment against him.  Subsequently, on April 8, 2010, the Grand Jury handed down a superseding indictment, charging him with two counts of advertising

material involving the sexual exploitation of minors, one count of distribution of material involving the sexual exploitation of minors, and one count of possession of material involving the sexual exploitation of minors.  (Dkt. No. 42).

On December 17, 2010, Salamon appeared with counsel and pled guilty to all four counts.  The plea was offered pursuant to Fed. R. Crim. P. 11(c)(1)(c), with an agreed prison term of 236 months.  Salamon confirmed at the plea proceeding that he had read and understood the plea agreement, discussed it with his attorney, and recognized that he would likely receive a sentence of 236 months in custody.  He confirmed at that time that his plea was entirely free and voluntary.  On May 25, 2011, Salamon appeared and received the agreed sentence of 236 months.

On June 14, 2012, Salamon, through counsel,[1] filed this motion to vacate, contending that he received ineffective assistance of counsel.  The government subsequently requested an order directing Salamon to provide more details regarding his allegations.  On September 25, 2012, the court ordered Salamon to file a "full and complete statement of his version of every pertinent conversation or communication

---

[1] Counsel representing Salamon for this petition is different from the one who represented him during the underlying proceedings.

that he had with [his attorney]." (Dkt. No. 106.)  The
court also ordered Salamon's trial counsel to respond to the
allegations by filing an affidavit listing "any pertinent
details concerning conversations, correspondence, or
documentation exchanged with Salamon." (Id.)  After some
delays, Salamon ultimately filed a supplemental memorandum
(Dkt. No. 122), trial counsel filed the requested affidavit
(Dkt. No. 130), the government filed its opposition to the
motion to vacate (Dkt. No. 139), and Salamon filed his reply
to the government's opposition (Dkt. No. 156).

### III.  FACTUAL BACKGROUND

The factual background of this case is particularly
ugly.  The charges stemmed from an FBI investigation into
Salamon's use of the internet to distribute a massive
quantity of child pornography, including hundreds of digital
images and videos of sadomasochism and sexual torture
involving very young children.  FBI undercover agents
searched Salamon's computer at various times and discovered
a page that brazenly advertised his interest in receiving,
distributing, and exchanging child pornography:

> Welcome & Enjoy!!  We are all here for the same
> thing.  lol I share EVERYTHING I have, I ask that
> you do the same for me.  If you have nothing to
> share, I WILL DELETE YOU!!

(Criminal Compl., Dkt. No. 1, Litowitz Aff. at ¶ 13.)

After Salamon's arrest, the court ordered him detained

and appointed counsel to represent him.  By October 2009,
Salamon had privately retained another attorney to take over
his case.  In this petition, Salmon makes numerous
allegations regarding conduct by his retained lawyer that he
now identifies as constituting ineffective assistance of
counsel.  This attorney's responsive affidavit substantially
denies the alleged misconduct.  Because the conduct of
counsel, even if it occurred as Salamon alleges, does not
constitute ineffective assistance sufficient to justify any
habeas remedy, the court will accept Salamon's allegations
solely for purposes of this ruling.[2]  As will be seen,
Salamon's allegations describe, at worst, a rocky and
disappointing relationship with his lawyer, but nothing
approaching any constitutional deficiency.[3]

Salamon contends that he dismissed appointed counsel and
retained new counsel in part because the attorney told him
that he had worked in the federal system and, therefore, had
familiarity with this court's sentencing practices.  After
the new lawyer was retained, the two of them met only a few
times in the following year.  The lawyer did not accept

---

[2]  The facts, as alleged by Salamon, are drawn from his
declaration (Pet'r Decl., Dkt. No. 122, Attach. 1).

[3]  Although the fact is not determinative, it is worth
noting that no claim is made that Salamon was somehow innocent
of the very offensive crimes charged against him.  The
evidence against him was overwhelming.

Salamon's calls from detention.  Salamon grew frustrated by this and felt he was not getting sufficient information about his case.

On September 28, 2010, Salamon concedes that his attorney met with him and discussed a plea offer from the government, supposedly for a sentence of seventeen years in the federal correction facility in Butner, North Carolina. According to Salamon, his attorney warned him that, if he went to trial and was found guilty, the government might seek the maximum punishment, which was life imprisonment, and Salamon might serve this sentence in a maximum-security prison, subject to a daily 23-hour lockdown.  Counsel also advised that the undersigned planned to retire soon, and that if the case were transferred to another judge, that new judge would likely sentence him harshly if he were found guilty.  Salamon "came away from the September 28 meeting scared that [he] had no other option than to accept the 17-year offer, which [he] felt was unfair." (Pet'r Decl. at ¶ 9(I), Dkt. No. 122.)  Nevertheless, he told his attorney that he was not prepared to plead guilty.

On October 21, 2010, Salamon met again with his lawyer. At this meeting, counsel informed Salamon that the government's offer still stood at seventeen years' imprisonment, but that there were no longer guarantees that

he would serve his sentence at Butner.  Salamon left the meeting believing that, if he lost at trial, he could receive a sentence of thirty years to life, and that the government might seek a term of life in prison.  Despite this, he was still not prepared to plead guilty.

On November 3, 2010, Salamon appeared in court with his lawyer for a status conference.  At this conference, Salamon was surprised to hear his attorney inform the court that Salamon would be pleading guilty to some or all of the charges.  By this time, apparently, Salamon's understanding was that he might plead guilty to Counts Three and Four, and proceed to trial on Counts One and Two.  Despite counsel's representations to the court and counsel's advice during their meetings that Salamon should accept the plea offer, Salamon declined to agree to plead guilty.  The court set trial for February 7, 2011.

When Salamon and his attorney next met on November 16, 2010, counsel was accompanied by a privately retained computer forensic expert.  According to Salamon, the expert opined that Salamon would most likely receive a life sentence if convicted at trial and advised Salamon to avoid trial.

Two days later, counsel met with Salamon again and presented him with two draft plea agreements.   One of the agreements was pursuant to Fed. R. Crim. P. 11(c)(1)(B).

6

Under this agreement, Salamon would plead guilty without any agreed term.  This alternative had the advantage that Salamon's counsel could argue for a downward departure from the Guideline range and request a sentence of fifteen years, the minimum mandatory term.  This first alternative, however, also had the disadvantage that it permitted the government to seek a penalty within or above the Guideline range.

The second draft agreement was pursuant to Rule 11(c)(1)(C).  It set forth an agreed sentence, binding on both parties, of 236 months[4] to be followed by 180 months of supervised release.  Counsel read this second agreement line-by-line to Salamon and recommended this agreement.  He told Salamon -- correctly, in fact -- that the other agreement exposed him to the risk of a sentence greater than 236 months.

After listening to his attorney's recommendation, Salamon signed the 11(c)(1)(C) agreement on November 18, 2010. Salamon knew that this agreement contained a clause expressing his satisfaction with counsel, but he now contends that he was not actually satisfied.  Salamon states that

---

[4]   The record is unclear why the agreed term under discussion at this point was for 236 months, nearly twenty years, whereas previous discussions had focused (according to Salamon) on a potential agreed sentence of seventeen years.

counsel should have, but did not, explain the ways to challenge the application of the Guidelines or the possibility that the undersigned might impose a sentence below the applicable range.

On December 17, 2010, Salamon pleaded guilty to a slightly modified version of the Rule 11(c)(1)(C) agreement. At this hearing, Salamon acknowledged that he faced the following penalties: on Counts One and Two, a minimum mandatory sentence of 15 years and a maximum sentence of 30 years, which the court could run consecutively for a maximum of 60 years; on Count Three, a minimum mandatory sentence of 5 years and a maximum sentence of 20 years; and on Count Four, a maximum sentence of 10 years.

In his colloquy with the court, Salamon acknowledged that he had read the plea agreement, reviewed it with his attorney, and understood it.  He also confirmed that he understood that the court would "very likely" impose the "extremely heavy" sentence that the parties had agreed to. (Change of Plea Hr'g Tr. 15:22-23, Dkt. No. 82.)  Salamon stated that he had sufficient time to speak with his attorney and was satisfied with his representation, and that he understood he was waiving his rights to both appeal and to collaterally challenge his conviction and sentence.

On May 25, 2011, the court sentenced Salamon to 236

months of incarceration to be followed by 180 months of supervised release.  The court acknowledged that the sentence was "extremely severe," but also "reasonable" in light of Salamon's conduct.  (Sentencing Hr'g Tr. 7:19-21, Dkt. No. 83.)  The term of imprisonment was in the middle of Salamon's Guideline range of 210 months to 262 months.

## IV.  ANALYSIS

### A.  Standard of Review

There are limited circumstances under which a federal prisoner may challenge his sentence under 28 U.S.C. § 2255(a).  A petitioner may move to vacate on the bases that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  Id.; see also Moreno-Morales v. United States, 334 F.3d 140, 148 (1st Cir. 2003) (quoting David v. United States, 134 F.3d 470, 474 (1st Cir. 1998)).  This last basis, though termed the "catch-all category," is quite circumscribed and "includes only assignments of error that reveal 'fundamental defect[s]' which, if uncorrected, will 'result[] in a complete miscarriage of justice,' or irregularities that are 'inconsistent with the rudimentary demands of fair

procedure.'"  David, 134 F.3d at 474 (quoting Hill v. United
States, 368 U.S. 424, 427-28 (1962)) (alterations in
original).  A "[p]etitioner bears the burden of establishing
that [he] is entitled to relief under § 2255."  Troy v.
United States, 946 F. Supp. 2d 172, 177 (D. Mass. 2012).

B.   Ineffective Assistance of Counsel Claim

Salamon contends that his trial attorney rendered
ineffective assistance during the plea bargaining process
resulting in a violation of the Sixth Amendment.  Claims of
ineffective assistance of counsel are governed by Strickland
v. Washington, 466 U.S. 668 (1984).  Under Strickland,
Salamon must demonstrate (1) counsel's performance or actions
were deficient or unreasonable, and (2) counsel's performance
prejudiced him so that there is a "reasonable probability"
that the outcome would have been different absent the
deficient performance.  Id. at 695.  Moreover, there is a
presumption of reasonable performance on the part of the
attorney, id. at 689, and the petitioner bears the burden of
overcoming that presumption, Cirilo-Munoz v. United States,
404 F.3d 527, 530 (1st Cir. 2005).

The first prong of Strickland assesses objectively
whether counsel's performance or actions were deficient or
unreasonable.  Salamon alleges that trial counsel failed to
advise him adequately of the possibility of pleading guilty

without a plea agreement, to discuss the court's sentencing practices, to advise him correctly about Bureau of Prison procedures, and to advise him about his right to challenge the child pornography enhancements under the Guidelines. Salamon also maintains that, because many of his images or video files are duplicates and were obtained via a peer-to-peer network, trial counsel should have explained to the court that Salamon's conduct was not as egregious as it appeared.

It is fundamental that in analyzing a claim of ineffective assistance of counsel "[j]udicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689.  If an attorney's choice or course of action can reasonably be characterized as trial strategy and was "made after thorough investigation of law and facts relevant to plausible options," those decisions "are virtually unchallengeable."  Id. at 690; Sleeper v. Spencer, 510 F.3d 32, 39 (1st Cir. 2007) (quoting Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (stating that counsel has "wide latitude in deciding how best to represent a client")).

Here, there is no dispute that trial counsel met repeatedly with Salamon, discussed the possibility of a plea, and reviewed the Rule 11(c)(1)(C) plea agreement with him line-by line.  Salamon offers no argument, and on this record

11

could offer no argument, that he did not understand the
proposal.  In fact, this case presents the unusual
circumstance that Salamon apparently had two alternative plea
agreements to assess, each with advantages and disadvantages.
Additionally, it is undisputed that Salamon represented to
the court at the time that he was satisfied with trial
counsel and that he understood he was waiving his rights to
both appeal and to collaterally challenge his conviction and
sentence.[5]  In sum, there is no allegation that Salamon did
not clearly understand the plea agreement or that it was in
any way breached.  Nothing in counsel's performance, even
accepting Salamon's allegations, even comes close to
satisfying the Strickland standard.

Even if he could show that his counsel's performance was
constitutionally deficient, Salamon cannot satisfy the second
Strickland criterion, which requires a showing of prejudice.
Salamon has the burden of establishing that there is a
"reasonable probability" that the outcome would have been
different absent the deficient performance.  Strickland, 466
U.S. at 695.  Specifically, Salamon must show "that, but for
counsel's errors, he would not have pleaded guilty and would
have insisted on going to trial."  Hill v. Lockhart, 474

_____

[5]  Salamon's waiver is likely fatal to his petition here.
In view of the absence of any substantive merit to the
petition, the analysis has not focused on this issue.

U.S. 52, 59 (1985).  Salamon has not come within a mile of
carrying this burden.

Salamon has not established that his federal sentence
would have been any shorter if, despite counsel's advice, he
had chosen to offer his plea pursuant to the other draft
agreement or declined to plead guilty and proceeded to trial.
The record is clear that the evidence against Salamon was
both extremely distasteful and overwhelming; he does not
argue otherwise.  Any suggestion that Salamon would have been
acquitted at a trial is, at best, pure speculation.  Equally
speculative is the notion that, absent the agreed plea
agreement, the court would have imposed a sentence below the
236-month mark.  It is equally possible that the court may
have imposed -- it certainly would have considered -- a
sentence at the top of the Guideline range, or even an upward
variance in light of the brazen egregiousness of Salamon's
conduct.  The record is flatly insufficient to demonstrate,
or even suggest, that there was a "reasonable probability"
that the outcome would have been different absent counsel's
allegedly deficient performance.  Based on the facts alleged,
Salamon has not carried his burden to show he was prejudiced
by trial counsel's representation.

Finally, the record of this case falls far short of
satisfying the "fairly heavy burden" Salamon must carry to

obtain an evidentiary hearing.  <u>United States v. McGill</u>, 11 F.3d 223, 225 (1st Cir. 1993).  It is well established that "a prisoner who invokes § 2255 is not entitled to an evidentiary hearing as a matter of right." <u>David</u>, 134 F.3d at 477.

The court may forgo an evidentiary hearing "when (1) the motion is inadequate on its face, or (2) the movant's allegations, even if true, do not entitle him to relief, or (3) the movant's allegations 'need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible.'" <u>Id.</u> (internal quotations omitted).  An evidentiary hearing is only required where the record and filings in the case, or an expanded record, cannot conclusively resolve substantial issues of material fact, and "when the allegations made, if true, would require relief." <u>United States v. Fournier</u>, 594 F.2d 276, 279 (1st Cir. 1979).  Furthermore, a hearing is not required "where the district judge is thoroughly familiar with the case as, for example, when he presides at both a change of plea hearing and sentencing." <u>Ouellette v. United States</u>, 862 F.2d 371, 377 (1st Cir. 1988).

Here, even accepting Salamon's allegations, he is not entitled to a hearing.  The record starkly lacks any facts that, if accepted, would justify relief.

14

Moreover, the undersigned, having presided at both the change of plea hearing and the sentencing, is familiar with this case and is in the position to assess whether Salamon suffered prejudice by accepting the plea agreement.  He did not.  The sentence was based on Salamon's own energetic and shameless purveying of the most appalling child pornography. Even accepting as true all of Salamon's allegations, his attorney's performance did not come close to falling below the reasonableness standard for adequate representation, and certainly Salamon was not prejudiced in any way.

For the foregoing reasons the motion to vacate (Dkt. No. 99) is hereby DENIED, and the petition is ordered dismissed. This case may now be closed.

It is So Ordered.

                              /s/ Micheal A. Ponsor
                              MICHAEL A. PONSOR
                              United States District Judge

15